In the
# United States Court of Appeals
## For the Seventh Circuit

No. 08-1151

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ERIK D. ZAHURSKY,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 2:06-cr-00109-RL-APR-1—**Rudy Lozano**, *Judge.*

ARGUED MAY 8, 2009—DECIDED SEPTEMBER 1, 2009

Before CUDAHY, MANION, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* A jury convicted Erik D. Zahursky of attempting to coerce or entice a minor under the age of eighteen to engage in sexual activity in violation of 18 U.S.C. § 2422(b). The district court sentenced him to 262 months' imprisonment and 20 years' supervised release. Zahursky appeals his conviction and sentence. He challenges the denial of his motion to suppress evidence obtained pursuant to a warrantless search of his

vehicle, the admission at trial of certain evidence under Federal Rule of Evidence 404(b), and the application of a two-level enhancement under U.S.S.G. § 2G1.3(b)(2)(B) for unduly influencing a minor. We affirm Zahursky's conviction, but vacate his sentence and remand for resentencing.

## I. Background

On June 2, 2006, someone using the screen name "Gracepace101" ("Gracepace") contacted "Sad_Shelly200" ("Shelly") in an adult internet chat room in *Yahoo!*. Shelly was the screen name of a fictitious fourteen-year-old girl created by Special Agent Ryan Moore, a member of the Electronic Crime Squad of the United States Secret Service. Shelly's *Yahoo!* profile which could be viewed by other persons in the chat room included a photo of a young girl. Moore checked the *Yahoo!* profile for Gracepace and learned that Gracepace's real name was Erik D. Zahursky.

In the first chat session, Zahursky initiated contact with "ur a cutie—[b]ummer i am old enough to be ur daddy." Shelly asked Zahursky how old he was, and he answered "34." He said that he was looking for ladies, but most were too far away, taken, too old or too young, but added that "i have [d]one a 14 year ol[d]." Zahursky asked Shelly if she was sexually active and whether she liked "older men." He stated that she was "lil young to be intimate with" unless she didn't mind. Zahursky asked Shelly where she lived and offered to meet with her to engage in sexual activity, saying: "woul[d] u like to

[h]ave sex wit[h] me?" Shelly asked about his previous sexual encounters and whether the women were "like me?" Zahursky responded, "One was, s[h]e is now 18." The chat session continued for almost two hours with Zahursky explaining what he wanted them to do to each other sexually. About midway through the chat session, Zahursky suggested that he and Shelly meet and "play at [yo]ur house w[h]ile mommy is at work?" He cautioned that they would have to be discreet "because of society's view of age." Shelly asked about "the other girl like me." Zahursky reiterated that she was eighteen years old and said the last time he saw her she was fifteen. A few minutes later, Zahursky emailed Shelly, stating that "to initiate [yo]u into womanhoo[d] would be an honor." He also expressed an interest in a threesome involving two ladies.

Moore, posing as Shelly, had numerous chats and email communications with Zahursky almost daily from June 2 to June 21, 2006. In their chats and emails, Zahursky gave detailed descriptions of the sexual activities in which he wanted to engage with Shelly. His sexual intentions were clear. On June 10, Zahursky emailed Shelly that he would try to visit her the last two weeks of July.

On June 13, Zahursky emailed Shelly about having a threesome with two girls. He said that he was on the internet a few days before and "found another 14-year-old lady who might be interested in a 3-some." He discussed the sexual activities that the three of them could do together. Shelly wrote back to Zahursky, stating that she

had figured out how they could get together—she would tell her mom that she was staying over with her friend Lindsey. In an instant message later that evening, Shelly asked Zahursky if he really wanted to be with her since she was inexperienced, and he said, "yes—we can experience each other—want to be with an old man? Another girl your age?" Shelly wrote, "sure, but I'm only 14, are you sure you still want me?" Zahursky replied, "the other girl is 14." He added that "Holly" was asking whether Shelly liked her. The next day, Zahursky emailed Shelly that the other fourteen-year-old was "Holly1989cutie" ("Holly").

Subsequently, he emailed Shelly that he hoped they could get together and that Holly could join them. He also suggested that Shelly's friend Lindsey might like to join them for "a sleep over for a week." Shelly emailed Zahursky on June 18 indicating that Lindsey was interested in joining them but would be away in July, so they had to meet in June. In another chat session, Shelly told Zahursky that Lindsey wanted to know if he had "any experience with girls our age, because she wants to know if you know how to treat us so it won't hurt." Zahursky wrote back "I won't hurt you. I have had one at 14." Shelly questioned, "For real?" and Zahursky replied, "Yes."

Zahursky and Shelly arranged to meet on June 21 at a Starbucks in Valparaiso, Indiana. He told her that he drove a gold Mercury Sable and described the clothing he would be wearing to their meeting. When Zahursky said he did not have enough money for a hotel room,

Shelly suggested that they stay with Lindsey in her sister's dorm room. Subsequent emails and chats disclose that Zahursky and Shelly agreed to spend a few days together in the dorm room.

On June 19, Zahursky sent an email to Lindsey, using Shelly's email account, discussing his sexual intentions for the three of them. He asked whether he should bring condoms. Later that afternoon in a conversation about their meeting, Zahursky asked Shelly, "u want me to bring con[d]oms?" Shelly asked about hooking up "with the other girl that you met." Zahursky said that the other girl's screen name was "Holly1989cutie." Later he mentioned Holly again, saying that he was trying "to get a meet" for the three of them. Shelly asked if Zahursky was going to bring the K-Y stuff since it was her first time and she didn't want it to hurt. He said that he would check a pharmacy for K-Y warming lube. In a June 20 instant message, Shelly again asked if Zahursky was going to bring the K-Y. He responded that he had to check the pharmacy and that he would have the lube.

On June 21, Zahursky drove from his home in Lexington, Illinois, across state lines to the Starbucks in Valparaiso. He was driving a Mercury Sable and wearing the clothing he had described to Shelly. When he arrived at Starbucks, he went inside where he was approached by Moore and other agents who asked him to step outside. The agents took Zahursky into custody, patted him down, and handcuffed him in the parking lot. Moore knew from Zahursky's conversations with Shelly that Zahursky had discussed the use of condoms and had said

that he would bring some form of K-Y warming lubricant to his meeting with Shelly. However, no condoms or K-Y lubricant were found on Zahursky's person.

Meanwhile, Secret Service Agent Richard Bardwell had begun to search Zahursky's vehicle located outside of Starbucks. In the glove box, Bardwell found a coin purse that contained three condoms. From the trunk, he recovered a duffel bag that contained lubricant and more condoms. The agents searching the vehicle also found a printed copy of directions from Zahursky's residence in Illinois to the Starbucks in Valparaiso and a printed email message between Zahursky and Shelly. No warrant to search Zahursky's vehicle had been obtained.

Then the agents transported Zahursky to the Valparaiso police station where he was interviewed by Moore and another agent. Prior to any questioning about the offense, the agents advised Zahursky of his *Miranda* rights. Zahursky waived them and gave a recorded statement. During the interview, Zahursky stated that he was in Valparaiso to meet Shelly and Lindsey, two fourteen-year-old girls with whom he had on-line correspondence and with whom he intended to engage in sex. He also gave written consent to search his vehicle. At some point during the interview, however, the agents had told Zahursky about some of the items they had found in his car. It is unclear whether this occurred before or after Zahursky gave his consent to search the vehicle.

Zahursky was tried by a jury. The district court, over the defendant's objection, admitted three pieces of evidence under Rule 404(b). The first was testimony by a

young lady (who we will refer to as "SS") that she had sexual intercourse with Zahursky on two occasions five years earlier when she was fourteen or fifteen years old. The second piece of evidence was an internet chat on June 14, 2006, between someone using the Gracepace screen name and someone with the screen name "Xanthery." The person using the Gracepace name asked Xanthery if she would "ever consi[d]er [h]aving sex with an ol[d]er guy—like maybe me?" Xanthery's response was, "would you ever have sex with someone my age??" The reply was, "i have—14."

The third piece of Rule 404(b) evidence was several internet chats from June 11 through 15, 2006, between Zahursky and someone with the screen name "Holly1989cutie." On June 11 Holly identified herself as a fourteen-year-old female and asked if Zahursky liked younger girls. He said yes and offered to teach Holly how to have sexual intercourse and receive oral sex. Holly asked Zahursky if he had been with girls her age, and he answered yes, a fourteen-year-old. He suggested that while Holly's mom was at work, they could have a few sessions and continue at a hotel. He described the sexual things he wanted them to do to each other. Later that day, he sent Holly a message, saying that he couldn't wait to touch her all over. On June 13, Zahursky sent Holly an instant message, stating that he may have found another fourteen-year-old girl who would like to join them in a threesome. He said he wanted the three of them to get together for a few days and get acquainted sexually. Zahursky sent a similar message a few hours later, this time indicating that the other

fourteen-year-old's screen name was "Sad_Shelly200." On June 15, he sent Holly a message saying that he could come over while her mom was at work so they could get to know each other and that she could spend the night or a couple of days with him "playing naughty."

Following the admission of the Rule 404(b) evidence, the district court gave the jury limiting instructions. The court instructed that SS's testimony and the chats between Gracepace101 and Holly1989cutie could be considered "only on the question of intent, motive, absence of mistake and modus operandi" and "only for this limited purpose." The court also instructed the jury that the evidence of the chat between Gracepace101 and Xanthery could be considered "only on the question of intent, motive and absence of mistake" and only for such limited purpose.

Zahursky testified at trial. He claimed that he talked to minors in adult chat rooms to use "reverse psychology" to get them to leave the chat rooms. He alleged that he was about to cut off the chats with Shelly when he suspected she was a cop, which made him curious, so he went to meet her to confirm his suspicions. He denied that he was going to the Starbucks to meet Shelly and have sex with her.

The jury convicted Zahursky of attempting to coerce or entice a minor under the age of eighteen to engage in sexual activity in violation of 18 U.S.C. § 2422(b) as charged.

Before sentencing, a probation officer prepared a Presentence Investigation Report ("PSR"). The PSR calcu-

lated Zahursky's offense level based on the charged offense and one "pseudo count" based on the internet chats with Holly1989cutie. Under the Guidelines in effect at the time of sentencing, the base offense level for a § 2422(b) conviction was 28. The PSR did not apply a two-level enhancement for the charged offense under U.S.S.G. § 2G1.3(b)(2)(B) for unduly influencing a minor because an undercover officer was used, but did apply the enhancement for the pseudo count. The PSR also added two levels under U.S.S.G. § 2G1.3(b)(3) for use of a computer and two levels under U.S.S.G. § 3C1.1 for obstruction of justice. Accordingly, the adjusted base offense level for the charged offense was 32, and the adjusted offense level for the pseudo count was 34. Applying U.S.S.G. § 3D1.4, one point each was added for the charged offense and the pseudo count to the higher adjusted base offense level, resulting in a combined adjusted offense level of 36.

At sentencing, the district court concluded that the PSR properly calculated Zahursky's offense level and criminal history category. However, the court increased his criminal history category by three points, based on his prior criminal acts not resulting in conviction in violation of § 2422(b). In doing so, the court relied on the "many instances" of internet chats in which Zahursky attempted to solicit sex from individuals he believed were minors. The court also relied on his statutory rape of a minor. This put Zahursky in criminal history category II. Given that criminal history category and an offense level of 36, the Guidelines range was 210 to 262 months. The court sentenced Zahursky to 262 months' imprison-

ment and 20 years' supervised release. This appeal followed.

## II.  Analysis

Zahursky makes three arguments on appeal. He first challenges the denial of his motion to suppress the evidence found during the warrantless search of his vehicle. Second, he contends that the district court erred in admitting evidence pursuant to Rule 404(b). Third, he argues that the court erred in applying a two-level enhancement under U.S.S.G. § 2G1.3(b)(2)(B) for unduly influencing a minor.

## A.  Search of Zahursky's Vehicle

Zahursky contends that the district court erred in denying his motion to suppress the evidence found during the search of his vehicle. We review the district court's determination of probable cause de novo. *United States v. Scott*, 516 F.3d 587, 589 (7th Cir. 2008).

A warrantless search is per se unreasonable under the Fourth Amendment subject to a few well-established exceptions. *Arizona v. Gant*, 129 S. Ct. 1710, 1716 (2009). The agents lacked a warrant to search Zahursky's car, so the government must show by a preponderance of the evidence that the search fell within one of the recognized exceptions to the warrant requirement. *United States v. Basinski*, 226 F.3d 829, 833 (7th Cir. 2000). One of the exceptions is the automobile exception first recognized

in *Carroll v. United States*, 267 U.S. 132 (1925). Under this exception, where there is probable cause to believe that a vehicle contains contraband or evidence of a crime, law enforcement may conduct a warrantless search of the vehicle. *Id.* at 153-56; *see also United States v. Pittman*, 411 F.3d 813, 817 (7th Cir. 2005).

"Probable cause" exists where based on a totality of the circumstances "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see Scott*, 516 F.3d at 589. It requires a probability, not absolute certainty, that contraband or evidence of a crime will be found. *United States v. Farmer*, 543 F.3d 363, 377 (7th Cir. 2008); *see also United States v. Sidwell*, 440 F.3d 865, 869 (7th Cir. 2006) (stating that "probable cause requires only a probability or a substantial chance that evidence may be found"); *United States v. Funches*, 327 F.3d 582, 586 (7th Cir. 2003) (indicating that probable cause does not require "evidence demonstrating that it is more likely than not" that evidence may be found). In determining whether there is probable cause to search, law enforcement officers may draw reasonable inferences from the facts based on their training and experience. *See, e.g.*, *United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006).

Zahursky argues that when the agents began searching his car they lacked probable cause to believe that contraband or evidence of a crime would be in the vehicle. The district court found it was reasonable for the agents to believe that Zahursky had condoms and lubricant and found further that "when the agents discovered that

[Zahursky] was not carrying the condoms and lubricant on his person, a reasonable officer would have probable cause to search the car he drove because it was the only other area available to Defendant to store the condoms and lubricant." The implication is that probable cause to search the car did not exist until the agents discovered no condoms and lubricant on Zahursky's person.

We conclude, however, that the record establishes that probable cause to search the vehicle existed even before the discovery that Zahursky didn't have any condoms or lubricant on his person. First, the agents knew that Zahursky was the man they wanted. He arrived at Starbucks, the designated meeting place, in the make and color of car that he had described in his chats with Shelly. He was wearing the clothing he had told Shelly he would be wearing, and the agents could observe that his physical appearance fit the one he had described to Shelly. The agents also knew from the internet chats and email messages with Shelly that Zahursky planned to bring condoms and lubricant with him. Thus, they had probable cause, based on Zahursky's own statements, to believe that Zahursky had these items, which would be evidence of a crime, *see* 18 U.S.C. § 2422(b), with him when he met Shelly on June 21.

Furthermore, it was reasonable to believe that Zahursky would have left these items in his car instead of taking them into Starbucks. He surely wasn't going to use the condoms and lubricant inside Starbucks. Zahursky and Shelly had planned only to meet at the Starbucks

before going to Lindsey's sister's dorm room where they planned to engage in sexual activity. It seems just as probable, if not more probable, that Zahursky would leave these items safely in his car until he reached his end destination rather than carrying them—need-lessly—into a public coffee shop. Perhaps he would have a condom or two and some lubricant on his person. But based on his chats and emails with Shelly, it was rea-sonable to believe that Zahursky would have a collec-tion of condoms and lubricant with him. He did, after all, anticipate repeated and continuous sexual activity with Shelly (and Lindsey) rather than one, brief sexual en-counter. So, even if incriminating evidence had been found on his person, that would not negate the proba-bility that more of the same would be found in his car.

Moreover, as the government argues, the agents had probable cause to search the car for evidence of the crime other than condoms and lubricant. They could search, for example, for evidence of Zahursky's trip from Lexington, Illinois, to Valparaiso, Indiana. Using a "means of interstate . . . commerce" is an element of the offense. There was a fair probability that the agents would find some evidence of Zahursky's interstate travel in his car—perhaps a map and/or directions, or a toll or gas receipt. These types of things likely would be found in a vehicle that had been driven some distance (150 miles based on Zahursky's testimony) and across state lines. And, as we know, the agents did find a printout of direc-tions from Zahursky's house in Illinois to the Starbucks in Valparaiso.

Zahursky further contends that none of the policy justifications for the automobile exception apply in his case. The automobile exception is justified by a vehicle's "ready mobility" which makes "immediate intrusion" necessary to prevent the destruction of evidence. *United States v. Washburn*, 383 F.3d 638, 641 (7th Cir. 2004). The second justification for the exception is the individual's lesser expectation of privacy in a vehicle. *Id.* Zahursky maintains that there was no threat that his car would be moved or become mobile—it had been seized and was to be impounded—so the first justification is inapplicable. His argument is foreclosed by *Washburn*.

The defendant in *Washburn* had exited his van and, when he returned was surrounded by officers with their weapons drawn and ordered to the ground. The officers obtained the keys to the van and searched it. The defendant moved to suppress the evidence found in that search. The district court concluded that the automobile exception applied and that the search was valid. *Id.* at 640-41. On appeal, the defendant argued that the automobile exception was inapplicable because his van had lost its mobility at the time of the stop and he lacked access to his van at the time of the search. *Id.* at 641. We held that as long as the van "was inherently, even if not immediately, mobile, the application of the automobile exception was still valid based on the diminished expectation of privacy in one's vehicle." *Id.*; *see also United States v. Matthews*, 32 F.3d 294, 299 (7th Cir. 1994) (stating that "the mobility of the vehicle is not essential to the application of the automobile exception. . . . [T]he diminished expectation of privacy alone is sufficient to

conduct a search on probable cause."). The defendant's lack of access to the vehicle at the time of the search did not matter because the van was still inherently mobile. *Washburn*, 383 F.3d at 641.

Similarly here, the agents had arrested Zahursky, placed him in custody and seized his car. Thus, at the time of the search, Zahursky no longer had access to his car. Still, his car was inherently mobile and he had a lesser expectation of privacy in it. Therefore, the automobile exception applied, and Zahursky's lack of access didn't matter. In addition, the agents had no reason to know that Zahursky traveled alone or that an accomplice would not have some means of mobilizing the vehicle.

Zahursky complains that there were no unforeseeable or exigent circumstances that would have prevented the agents from obtaining a search warrant for the vehicle. True enough, but Zahursky offers nothing to suggest that the agents were required to obtain a search warrant here. And given the application of the automobile exception to the warrant requirement, they were not.

Finally, Zahursky challenges the scope of the search, asserting that the condoms and lubricant were not in plain view. Where law enforcement agents have probable cause to search a vehicle, they may search all areas in the vehicle in which contraband or evidence of criminal activity might be found, including closed containers, packages, compartments, and trunks. *See United States v. Ross*, 456 U.S. 798, 818-19 (1982); *Scott*, 516 F.3d at 589. Therefore, the agents could lawfully search the glove compartment and trunk. It was reasonable to believe

that condoms might be found in the coin purse and duffel bag; thus, upon finding the purse and bag, the agents could lawfully search those items as well. It also was reasonable to believe that lubricant might be found in the duffel bag which likely contained Zahursky's clothes and personal effects for his overnight visit with Shelly.

In sum, the agents had probable cause to search Zahursky's car. Therefore, the search was justified under the automobile exception to the warrant requirement and the district court did not err in denying the motion to suppress evidence found in the vehicle. (Because we find that probable cause to search Zahursky's vehicle existed and thus that the automobile exception applied, we need not consider whether the search was justified as an inventory, the other exception relied on by the district court.)

### B. Admission of Rule 404(b) Evidence

Zahursky's second challenge on appeal is to the trial court's admission of evidence under Rule 404(b). The court admitted evidence of Zahursky's internet chats with Xanthery and Holly and allowed SS to testify. We review the admission of Rule 404(b) evidence for an abuse of discretion. *United States v. Lee*, 558 F.3d 638, 647 (7th Cir. 2009). Evidence is admissible under Rule 404(b) if:

> (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged;

(2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue;

(3) the evidence is sufficient to support a jury finding that the defendant committed the similar act; and

(4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

*Id.*

Zahursky argues that the district court erred in admitting evidence of the Xanthery chats because there was insufficient evidence that he conducted the chats. While Zahursky's parents and sister also had access to the computer on which the Xanthery chats were found, the evidence established that it was more likely than not Zahursky himself who engaged in those chats. Zahursky had access to his mother's computer and used it often, as demonstrated by the Shelly and Holly chats. The Xanthery chats occurred on June 14 during the same time frame that Zahursky admitted he was chatting with Shelly. Zahursky's admission to conducting the Shelly chats supports the inference that he conducted the Xanthery chats as well. The Xanthery chats also coincided with the timing of the Holly chats. The Xanthery chats and Holly chats were conducted by someone using the Gracepace screen name—which was created and used by Zahursky. The similarities in content between the Shelly chats and the Xanthery chats as well as the Holly chats support the inference that the same person was conducting those chats. In addition,

Zahursky stated in his chats with Shelly that he had thirty online sex meets. He even told her that he had "done a 14-year-old"—the same claim made by the person who chatted with Xanthery. And Zahursky's chats with Shelly revealed his sexual interest in young girls. All of this evidence was more than sufficient to support a jury finding that Zahursky engaged in the Xanthery chats.

Zahursky claims that segments of the Holly and Xanthery chats were not probative of his motive, intent, or lack of mistake but gave unnecessary, shocking, repulsive and sexually explicit details. Zahursky's knowledge and intent were at issue. *See* 18 U.S.C. § 2422(b). So was his motive. *See United States v. Sebolt*, 460 F.3d 910, 917 (7th Cir. 2006) ("establishing motive tends to prove a crime was committed"). "Prior instances of sexual misconduct with a child victim may establish a defendant's sexual interest in children and thereby serve as evidence of the defendant's motive to commit a charged offense involving the sexual exploitation of children." *Id.* In both the Holly and Xanthery chats, Zahursky admitted to having had sex with a fourteen-year-old. And, in the Holly chats Zahursky clearly expressed his sexual interest in fourteen-year-old girls. Zahursky's admission to having had sex with a fourteen-year-old and the sexually explicit nature of the Xanthery and Holly chats make them probative as to his intent and motive in chatting with Shelly and then meeting her at Starbucks.

The revelations of the girls' ages in the chats make the chat evidence probative as to Zahursky's knowledge

and absence of mistake. Holly told Zahursky that she was fourteen. Zahursky wrote Holly that he may have found another fourteen-year-old girl who might join them in a threesome and later identified the girl to Holly as none other than Shelly. Thus, this chat evidence is probative of Zahursky's knowledge that his target for sexual activity was a minor under the age of eighteen. The evidence is also probative as to the absence of any mistake on Zahursky's part regarding Shelly's age.

Zahursky next argues that the probative value of the Holly and Xanthery chats was substantially outweighed by excessively prejudicial details. He claims that the chats were cumulative evidence of his character. That evidence may be highly prejudicial does not compel its exclusion; the evidence must be *unfairly* prejudicial. *Sebolt*, 460 F.3d at 917. "Evidence is unfairly prejudicial only if it will induce the jury to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented." *United States v. Harris*, 536 F.3d 798, 809 (7th Cir. 2008) (quotation omitted). We give special deference to the district court's decision to admit evidence under Rule 403; we second-guess the district court's judgment "[o]nly in an extreme case." *Id.* (quotation omitted). Rule 403 provides for the exclusion of relevant evidence where "its probative value is sub-stantially outweighed by the danger of unfair prejudice . . . or needless presentation of cumulative evidence." Fed. R. Evid. 403; *see Harris*, 536 F.3d at 809.

Zahursky has not shown that the district court erred in its implicit determination that the probative value of the

chat evidence was not substantially outweighed by the danger of unfair prejudice or its cumulative nature. Zahursky denied going to meet Shelly with the intent to have sex with a minor. Without question, the chats were sexually explicit and detailed. In the chats with Holly, Zahursky wrote openly and graphically about his sexual fantasies and instructed Holly about sex and pleasuring men. The sexually explicit nature of the chat transcripts; Zahursky's open, graphic, and detailed discussions of his sexual fantasies; and his instructions to Holly about how to please men made this evidence highly probative. We see no reason to second-guess the district court's assessment that the "prejudicial" details were not unfairly prejudicial.

Lastly, Zahursky submits that SS's testimony was highly prejudicial because it was cumulative of information in the Shelly, Holly, and Xanthery chats; his confessions which were introduced into evidence; and his testimony on cross-examination. He also claims that SS's testimony inflamed the jury's emotions. However, SS's testimony was not merely cumulative; it came from a victim of Zahursky. Thus, SS's testimony was highly probative of Zahursky's intent and motive in chatting with and meeting Shelly. SS's testimony also showed that Zahursky intended to follow through with his plan to engage Shelly in sexual activities with him. Finally, it corroborated the accuracy of some of the critical vouching of his experience with an underage girl contained in the Shelly and Holly chats, thus further identifying Zahursky as the participant in those chats.

The Holly chats, Xanthery chats, and SS's testimony were admissible to rebut Zahursky's claims at trial as to why he chatted with Shelly about sex—to get minors to leave adult chat rooms; and why he drove to the Starbucks—not for coffee and not to meet Shelly for sex, but out of curiosity as to whether she was a college student or cop. This evidence also was admissible to rebut Zahursky's denial that he intended to have sex with a minor. Accordingly, this evidence was admissible to prove Zahursky's motive, intent, knowledge, and absence of mistake.

While this Rule 404(b) evidence might appeal to the jury's emotions (and surely didn't give anyone a favorable impression of Zahursky), the district court gave a limiting instruction, both after the jury heard the Rule 404(b) evidence and then again in the final jury instructions. "Absent any showing that the jury could not follow the court's limiting instruction, we presume that the jury limited its consideration of the testimony in accordance with the court's instruction." *Lee*, 558 F.3d at 649 (quotation omitted). Zahursky has not shown that the jury could not follow the court's limiting instruction. We therefore can assume that this instruction removed any unfair prejudice from the admission of the Rule 404(b) evidence. *See United States v. Vargas*, 552 F.3d 550, 557 (7th Cir. 2008) ("[W]e assume that limiting instructions are effective in reducing or eliminating unfair prejudice.").

In short, the district court did not abuse its discretion in admitting any of the Rule 404(b) evidence.

**C. Unduly Influencing a Minor Under U.S.S.G. § 2G1.3(b)(2)(B)**

Last is Zahursky's contention that the district court erred in applying an enhancement for unduly influencing a minor under U.S.S.G. § 2G1.3(b)(2)(B). Under § 2G1.3(b)(2)(B), which is applicable to the offense of conviction, the base offense level is increased by 2 offense levels if "a participant otherwise unduly influenced a minor to engage in prohibited sexual conduct." We review the district court's interpretation and application of the Sentencing Guidelines de novo. *United States v. Abbas*, 560 F.3d 660, 662 (7th Cir. 2009). We review its factual findings for clear error. *United States v. Pira*, 535 F.3d 724, 730 (7th Cir.), *cert. denied*, 129 S. Ct. 583 (2008).

In *United States v. Mitchell*, 353 F.3d 552 (7th Cir. 2003), we considered whether § 2A3.2(b)(2)(B)(ii) was applicable to sting operations where no illicit sexual conduct occurred. Section 2A3.2(b)(2)(B)(ii) provides for an enhancement if "a participant otherwise unduly influenced the victim to engage in prohibited sexual conduct." We held that § 2A3.2(b)(2)(B)'s enhancement "cannot apply where the offender and victim have not engaged in illicit sexual conduct." *Mitchell*, 353 F.3d at 557. We found that both the plain language of the Guideline and the commentary supported this conclusion. *Id.* at 556-57. And we reasoned that "[w]here no prohibited sexual conduct has occurred, there has been no undue influence." *Id.* at 559. Therefore, we concluded that § 2A3.2(b)(2)(B)(ii) did not apply "in the case of an

attempt where the victim is an undercover police officer." *Id.* at 554.

The "unduly influenced the victim to engage in prohibited sexual conduct" language in § 2A3.2(b)(2)(B)(ii) is substantially the same as the "unduly influenced a minor to engage in prohibited sexual conduct" language of § 2G1.3(b)(2)(B). Therefore, *Mitchell*'s reasoning should control here and leads to the conclusion that § 2G1.3(b)(2)(B) cannot apply where the defendant and the minor have not engaged in prohibited sexual conduct. Zahursky asserts that the district court thus erred in applying the Guideline because the record contains no evidence that he engaged in prohibited sexual conduct with Holly.

The government argues that "offense" as used in § 2G1.3(b)(2) includes not only the offense of conviction but also any other conduct that may be considered relevant conduct under the Guidelines. It asserts that *if* Zahursky's rape of SS and the two internet chats with Holly and Xanthery are considered relevant conduct, then they are part of the offense for purposes of § 2G1.3(b)(2). (The government does not go so far as to argue that all of this *should be* considered relevant conduct under the Guidelines.) According to the government, the question becomes whether Zahursky was successful in unduly influencing SS, Holly, or Xanthery. The answer, the government submits, is "yes," because (1) there is no question that Zahursky unduly influenced SS, and (2) there is evidence in the Holly chats of a meeting between Zahursky and Holly.

Putting aside the question of whether Zahursky's rapes of SS could be considered relevant conduct—and we doubt that they would since these events happened approximately five years earlier—the fact is that they were not considered relevant conduct. The PSR treated only the Holly chats as relevant conduct. The rapes of SS and the Xanthery chats were treated as "Conduct Other Than Relevant." Furthermore, the § 2G1.3(b)(2)(B) enhancement was applied to the pseudo count which was based only on the internet chats with Holly1989cutie, not on any conduct with SS. Thus, the enhancement was not based on the undue influence of SS. And, it seems that using the SS evidence to justify application of § 2G1.3(b)(2)(B) would amount to impermissible double counting because the district court increased Zahursky's criminal history category on the basis of the uncharged conduct with SS. *See, e.g.*, *United States v. Blum*, 534 F.3d 608, 612 (7th Cir.) (indicating that impermissible double-counting occurs when the district court imposes upward adjustments within the same Guidelines range that are premised on the same conduct), *cert. denied*, 129 S. Ct. 589 (2008).

Turning to Holly, we disagree that the Holly chats contain any evidence of a meeting between Zahursky and the person who used the Holly screen name. At oral argument, the government stated that a fair reading of the Holly chats supports the finding that Zahursky and Holly agreed to meet. Our reading of the Holly chats reveals talk about a possible meeting sometime in the future, but no evidence that an actual meeting ever took place. And even if we were to infer that there was

a meeting between Zahursky and Holly, the evidence provides no basis for inferring that there was any sexual contact between them. Nor does the record disclose who Holly is, that she is a minor, or even that she is a real person. Holly claimed to be fourteen, but nothing in the record corroborates the claim. Holly may have been an undercover agent posing as a young girl in internet chat rooms much like Agent Moore.

The district court thus erred in applying the enhancement for unduly influencing a minor under § 2G1.3(b)(2)(B). So we must decide whether that error was harmless.

An error is harmless only "when the government has proved that the district court's sentencing error did not affect the defendant's substantial rights (here-liberty)." *Abbas*, 560 F.3d at 667 (quotations and citations omitted). The government bears the burden of proving harmless error and does so by showing that "the Guidelines error did not affect the district court's selection of the sentence imposed," which "is not the same thing as proving that the sentence was reasonable." *Id.*

We have found sentencing errors harmless in a few cases. *See id.* at 666-67 (collecting cases). For example, in *Abbas*, we concluded that a sentencing error was harmless because the sentencing judge said that she would have imposed the same sentence even if the Guideline at issue—U.S.S.G. § 2C1.1—did not apply. *Id.* at 667. Similarly, in *United States v. Anderson*, 517 F.3d 953 (7th Cir. 2008), we found that the error in calculating the sentencing range was harmless because the district court

explicitly stated that it believed the sentence imposed was reasonable and would impose the same sentence even if its Guidelines calculations were incorrect. *Id.* at 965. And, under the version of the Guidelines which would have applied on remand, the sentencing range would have been the same as the range that the district court had used anyway. *Id.* at 966. The common thread in both *Anderson* and *Abbas* is that the sentencing court firmly indicated that it would impose the same sentence regardless of any sentencing error.

We have no firm assurance from the district court in this case that it would impose the same sentence even if its application of the two-level enhancement under § 2G1.3(b)(2)(B) was erroneous. The government says there is no reason to think that the undue influence enhancement affected the court's sentencing determination. True, the court found that Zahursky's criminal history category substantially under-represented the seriousness of his criminal history and did not reflect the likelihood that he would commit further crimes. The court also stated that it believed that Zahursky should receive a sentence substantially greater than that recommended in the Guidelines for his offense level and criminal history category. Therefore, the court used a criminal history category II in calculating the Guideline range, resulting in a range of 210 to 262 months. The court sentenced Zahursky to 262 months, at the upper end of the range. However, the court also said that it was "trying to give the defendant the benefit of the doubt."

The district court's statements in this case do not approach the firm assurances that we had in the cases

where we have found a sentencing error harmless. To be sure, the district court believed a substantial sentence, one that was greater than provided in the recommended range, was appropriate. But we are unconvinced that the court would have imposed the same sentence had it not improperly calculated Zahursky's Guideline range. An error in calculating the Guidelines range is "significant." *Gall v. United States*, 552 U.S. 38, 128 S. Ct. 586, 597 (2007); *see also United States v. Dean*, No. 08-3287, 2009 WL 2341676, at \*6 (7th Cir. July 31, 2009) (stating that "the district court . . . is required to calculate, in the course of arriving at the sentence, the appropriate guidelines sentencing range"). It is possible that the sentence would have been the same, but it is not certain. Therefore, we must remand for resentencing.

### III.

For the foregoing reasons, we AFFIRM the appellant's conviction, VACATE his sentence, and REMAND for resentencing consistent with this opinion.