**COURT OF APPEALS
DECISION
DATED AND FILED**

**September 22, 2020**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2019AP175-CR**

Cir. Ct. No.  **2015CF1582**

**STATE OF WISCONSIN**

**IN COURT OF APPEALS
DISTRICT III**

---

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

V.

SYNIKA ANTONIO KIRK,

   DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Brown County: THOMAS J. WALSH, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Seidl, JJ.

¶1    SEIDL, J.   Synika Kirk appeals a judgment, entered upon his guilty plea, convicting him of conspiracy to manufacture or deliver between 2500 and 10,000 grams of tetrahydrocannabinols (THC), contrary to WIS. STAT.

§ 961.41(1)(h)4. (2017-18).[1] Kirk contends the circuit court erred by denying his motion to suppress evidence found during a warrantless search of his automobile. Specifically, he argues the court erred by determining the search—which was conducted while Kirk's automobile was loaded and being carried on a car transport truck—was permissible under the so-called automobile exception to the warrant requirement. We conclude the officer who performed the warrantless search had probable cause to search Kirk's automobile. Consequently, the court properly determined the automobile exception to the warrant requirement applied, and we affirm.

## BACKGROUND

¶2      The following facts are taken from the testimony and other evidence introduced during a hearing on Kirk's motion to suppress evidence. In October 2015, state trooper Christopher Nicholas of the Kansas Highway Patrol stopped a car transport truck that was hauling several vehicles.[2] Nicholas performed this stop pursuant to his duties as a "drug interdiction" specialist. He explained that this specialty included him teaching "advanced interdiction classes at the Kansas Highway Patrol Academy" and teaching for a "federal organization that does drug interdiction training."

---

[1] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

[2] We note that a recording of this traffic stop, taken from Nicholas' dashboard camera, was played at the hearing on Kirk's motion to suppress evidence. The parties did not move this recording into evidence at the hearing, however, and the circuit court did not act on Kirk's post-hearing request to have the recording "formally entered as an exhibit." On appeal, Kirk filed a motion to supplement the appellate record with the recording, which we granted by order filed December 26, 2019. As a result, we have viewed the recording.

¶3      After stopping the car transport truck, Nicholas made contact with its driver, Pedro Ocampo, and he asked Ocampo to provide his logbook and bills of lading. Nicholas testified that, in reviewing Ocampo's logbook, he found some of the "down time listed on his log pages" to be suspicious. As an example, Nicholas explained that the log book showed that Ocampo had spent two days in Reno, Nevada, after loading the car transport truck and that "stopping someplace in between where [a driver is] coming from and where he's going is not normal."

¶4      When Nicholas asked Ocampo to account for his down time in Reno, Ocampo stated he had been trying to find new tires for the transport truck. Nicholas was not satisfied by this explanation, however, based on his belief that Reno was a large enough metropolitan area to find tires in less than two days.

¶5      Nicholas stated he next reviewed the bills of lading for the vehicles on the transport truck. On doing so, his attention was drawn to two vehicles in particular: a Chevrolet Impala and a Jaguar car.[3] The Impala drew Nicholas' attention because its bill of lading listed the same first name (with no last name) for both the sender and the recipient of the vehicle. This fact stood out to Nicholas because "[g]enerally on what I see on the bill of lading, it will have first name and a last name or two different names." In support of that point, Nicholas noted that the bills of lading for the other vehicles on the car transport truck—with the exception of the Jaguar—had full names listed.

¶6      In addition, Nicholas noted that the Impala's bill of lading provided two different phone numbers for the shipper and receiver, despite listing the same

---

[3] It is undisputed that the Kirk owned the Jaguar.

3

name for each. Nicholas explained, "The same guy says he's shipping it and receiving it, but it's two different phone numbers. So that's something that strikes me as pretty odd."

¶7 Nicholas then testified that the Jaguar's bill of lading was "a similar type of situation, gives first names, first name of Mario, as that's going from California to Wisconsin, again same area code, phone number, but different last four digits." Nicholas further noted that although the Jaguar's bill of lading listed it as a 1999 model, it was in fact a 1989 model. Finally, Nicholas believed it was suspicious that someone would pay the $900 cost to ship the Jaguar because the car was "not something that probably was really worth shipping from California to Wisconsin."

¶8 After completing a physical inspection of the car transport truck itself, Nicholas asked Ocampo for permission to search the Impala. Ocampo granted Nicholas permission to do so, and he provided Nicholas with the Impala's key. Nicholas then opened the Impala's back door, and he "immediately" smelled raw marijuana. He subsequently found large trash bags in the Impala which contained marijuana.

¶9 Following his discovery of the marijuana in the Impala, Nicholas informed Ocampo of what he had found and told him to turn off his truck. Nicholas then arranged to have the truck driven to a Kansas Department of Transportation building for further inspection. Before the truck left the scene of the traffic stop, however, Nicholas "remember[ed] the bill of lading on the Jaguar, and we talked about that, and I tried to get into it." After gaining access to the Jaguar, Nicholas found approximately twenty-five pounds of marijuana in its trunk.

¶10   The State ultimately charged Kirk with one count each of conspiracy to manufacture or deliver between 2500 and 10,000 grams of THC as a second or subsequent offense, possession of THC as a second or subsequent offense, and possession of drug paraphernalia.[4]   Kirk moved to suppress the marijuana and related evidence found in the Jaguar's trunk, arguing that the warrantless search of his vehicle violated his constitutional rights.

¶11   Following an evidentiary hearing, the circuit court denied Kirk's motion in an oral decision.  The court based its denial on its determination that the "automobile exception to the warrant requirement in this case existed; that probable cause existed, independent of anything else, as a result of what the officer learned about the Jaguar and as a result of the contraband that was discovered in the Impala."

¶12   Kirk subsequently pled guilty to the count of conspiracy to manufacture or deliver THC.  The remaining two counts were dismissed and read in for sentencing purposes.  He now appeals, arguing the circuit court erred by denying his suppression motion.  *See* WIS. STAT. § 971.31(10).

**DISCUSSION**

¶13   When reviewing a circuit court's decision on a motion to suppress evidence, we will uphold the court's findings of historical fact unless they are clearly erroneous.  *State v. Pinkard*, 2010 WI 81, ¶12, 327 Wis. 2d 346, 785

---

[4] The latter two charges were based on marijuana and a marijuana pipe which were discovered in Kirk's Green Bay residence during the execution of a search warrant.

5

N.W.2d 592. However, we independently review the court's application of constitutional principles to those facts. *Id.*

¶14 Both article I, section 11 of the Wisconsin Constitution and the Fourth Amendment to the United States Constitution guarantee the right to be free from unreasonable searches.[5] *State v. Faust*, 2004 WI 99, ¶10, 274 Wis. 2d 183, 682 N.W.2d 371. "Subject to a few well-delineated exceptions, warrantless searches are deemed per se unreasonable." *Id.*, ¶11. In this case, the State asserts—and the circuit court agreed—that trooper Nicholas' warrantless search of Kirk's Jaguar fell within the automobile exception to the warrant requirement.

¶15 The automobile exception to the warrant requirement permits police to search a vehicle without a warrant when: (1) there is probable cause to search the vehicle; and (2) the vehicle is readily mobile. *State v. Marquardt*, 2001 WI App 219, ¶33, 247 Wis. 2d 765, 635 N.W.2d 188. Here, Kirk does not dispute that his vehicle was readily mobile for purposes of the automobile exception.[6] Rather,

---

[5] The State contends on appeal, as it did in the circuit court, that Kirk did not have a reasonable expectation of privacy in the Jaguar after it was loaded onto the car transport truck. Based on that premise, the State argues Kirk does not have standing under the Fourth Amendment to challenge the search of the Jaguar. Because we conclude the court did not err by determining that Nicholas' warrantless search of the Jaguar fell within the automobile exception to the warrant requirement, we assume, without deciding, that Kirk has Fourth Amendment standing to challenge the search of the Jaguar. *See State v. Blalock*, 150 Wis. 2d 688, 703, 442 N.W.2d 514 (Ct. App. 1989) (court of appeals decides cases on the narrowest possible grounds). For the same reason, we need not address the State's alternative argument that Nicholas' search of the Jaguar was permissible under the third-party consent doctrine.

[6] For the sake of thoroughness, we note that whether a vehicle is "readily mobile" for purposes of the automobile exception turns on the vehicle's inherent mobility, as opposed to its demonstrated mobility. *See South Dakota v. Opperman*, 428 U.S. 364, 367 (1976); *see also United States v. Zahursky*, 580 F.3d 515, 523 (7th Cir. 2009) (automobile exception applied because vehicle "was inherently, even if not immediately, mobile") (citation omitted).

he contends Nicholas lacked probable cause to search his vehicle. For the reasons explained below, we disagree and conclude the automobile exception applied here.

¶16 As an initial matter, however, we address a line of argument Kirk first raises in his reply brief. Namely, Kirk appears to assert that the circuit court's implicit acceptance of the timeline to which Nicholas testified (i.e., that Nicholas first stopped the transport truck, then reviewed Ocampo's logbook and the bills of lading for all the vehicles on the truck, and then searched the Impala and the Jaguar) was clearly erroneous. Kirk reasons:

> [I]t does not appear that Trooper Nicholas viewed the Jaguar bill of lading prior to searching it. Trooper Nicholas admitted that he asked about the Impala's bill of lading after discovering the marijuana in the Impala, and then asked the driver if any other cars came from the same place as the Impala. If Trooper Nicholas had seen the Jaguar's bill of lading, he would have known the answer to that question. Trooper Nicholas then tells the driver that he wants to check all of the cars on the transport, without specifically mentioning the Jaguar or asking to see the Jaguar's bill of lading. Thus, it appears that the supposed discrepancies [in the Jaguar's bill of lading] were used after the fact to justify the search.

(Record citations omitted.)

¶17 As a general rule, we need not address issues raised for the first time in a reply brief. *See* ***State v. Anderson***, 215 Wis. 2d 673, 683, 573 N.W.2d 872 (Ct. App. 1997). Here, however, we choose to address Kirk's allegation that Nicholas relied on the information contained in the Jaguar's bill of lading "after the fact" to the extent necessary to explain that Kirk's belated allegation rests on a distortion of the record.

¶18 We begin by observing that Kirk misconstrues Nicholas' testimony that he asked about the Impala's bill of lading after discovering marijuana in it

with an admission by Nicholas that he had not already viewed the Impala's bill of lading before searching it. To explain, the recording of the traffic stop shows that immediately after making contact with Ocampo, Nicholas asked to see Ocampo's "log and his bills." Nicholas can then be heard, for approximately seven minutes, reviewing the bills of lading with Ocampo—including the bills for the "99 Jaguar … to Wisconsin" and for the "Impala."

¶19 Nicholas did not search the Impala until approximately thirty minutes after this discussion. To be sure, as Kirk correctly notes, Nicholas did ask to see the Impala's bill of lading after he discovered the marijuana during his search. Critically, though, Nicholas' full statement to Ocampo was that he needed Ocampo to "look up that bill of lading for that one *again*." (Emphasis added.) Thus, the record belies Kirk's assertion that Nicholas admitted he did not view the Impala's bill of lading until after he conducted his search.

¶20 Relatedly, Kirk's argument that Nicholas did not see the Jaguar's bill of lading until after he conducted a search of the Jaguar is unpersuasive. As explained above, Nicholas can be heard on the recording discussing the bill of lading for the "99 Jaguar … to Wisconsin" well before Nicholas searched the Jaguar. Thus, Kirk's argument that Nicholas need not have asked Ocampo if the Jaguar and the Impala came from the same place if he had already seen the vehicles' respective bills of lading ignores the facts in the record. And, there are multiple reasons why Nicholas may have asked that question, including to refresh his recollection and to see if Ocampo would answer truthfully or evade the question.

¶21 Finally, Kirk takes Nicholas' statement that he did not ask Ocampo about the Jaguar or its bill of lading out of context. This statement—which

defense counsel elicited from Nicholas at the suppression hearing after playing an approximately three-minute portion of the recording that took place after Nicholas found the marijuana in the Impala—simply reflected Nicholas' acknowledgement that he did not ask about the Jaguar during that portion of the video that had just been played.

¶22    For all these reasons, we reject Kirk's belated allegation that "many of Trooper Nicholas's explanations for why he searched the Jaguar appear to be post-hoc rationalizations for his search."  We now turn to Kirk's argument that Nicholas did not have probable cause to search the Jaguar.

¶23    Probable cause to search exists when, under the totality of the circumstances, sufficient facts exist to "excite an honest belief in a reasonable mind that the objects sought are linked with the commission of a crime, and that the objects sought will be found in the place to be searched." *State v. Lefler*, 2013 WI App 22, ¶8, 346 Wis. 2d 220, 827 N.W.2d 650 (citation omitted).  "Probable cause must be viewed in light of the knowledge and experience of the person conducting the search." *Id.*

¶24    We conclude that Nicholas had probable cause to search the Jaguar. We reach this conclusion based on the following circumstances known to Nicholas before he searched the Jaguar—which circumstances, we emphasize, must be viewed collectively and in light of Nicholas' experience as a "drug interdiction" specialist.

¶25    First, Nicholas knew that Ocampo's logbook contained an entry that was "not normal."  Moreover, Nicholas' experience gave him reason to be suspicious of Ocampo's explanation for this abnormal entry—namely, Nicholas

reasonably believed it would not, in fact, take two days to find tires for a truck in a metropolitan area.

¶26 Second, Nicholas did not believe the Jaguar's value justified the cost to ship it from California to Wisconsin. Nicholas reasonably questioned why someone would spend $900 to ship a car with a low value.[7]

¶27 Third, prior to searching the Jaguar, Nicholas knew that one other vehicle on the car transport truck (the Impala) contained marijuana. Thus, Nicholas knew that his suspicions regarding at least one vehicle on the car transport truck being involved in criminal activity were valid.

¶28 Fourth, Nicholas knew that the Jaguar's bill of lading contained entries that were not only suspicious, but suspicious in "similar" ways to the Impala's bill of lading. These similarities—i.e., both bills of lading listed the same first name, but no last name, for the shipper and receiver and also listed different phone numbers for the person identified as both the shipper and receiver—provided a link connecting the Impala and the Jaguar which would excite an honest belief in a reasonable mind that the Jaguar, like the Impala, contained illegal drugs or contraband. *See **Lefler***, 346 Wis. 2d 220, ¶8.

¶29 Kirk contends that these circumstances did not give rise to probable cause to believe that illegal drugs or contraband would be found in the Jaguar because "simply being in the vicinity of illegal activity does not create probable

---

[7] Kirk raises a largely undeveloped argument that Nicholas had no basis to estimate the Jaguar's value because "there was no evidence that Trooper Nicholas had any expertise in evaluating vintage British sports cars." We agree with the State, however, that Nicholas' testimony that he worked in a "body shop" prior to beginning his sixteen-year career in law enforcement provided a sufficient basis for him to estimate the Jaguar's value.

cause." In support of this contention, Kirk relies on the principle that a "person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search [a] person." *See **State v. Andrews***, 201 Wis. 2d 383, 396, 549 N.W.2d 210 (1996) (citing ***Ybarra v. Illinois***, 444 U.S. 85, 91 (1979)).[8]

¶30    Kirk's argument is unpersuasive because Nicholas' search of the Jaguar was based on "more" than its mere propinquity to the Impala. Namely, as just explained, the Jaguar's bill of lading—unlike any of the other bills of lading for the vehicles on the car transport truck—contained suspicious entries that were "similar" to the entries on the Impala's bill of lading. Once Nicholas found marijuana in the Impala, this link between the two vehicles—in conjunction with the other suspicious factors identified above—gave rise to probable cause to search the Jaguar.

¶31    Kirk also argues that there were a multitude of innocent explanations for the circumstances that Nicholas deemed suspicious. For example, Kirk states that "[t]here are any number of reasons [Ocampo] would spend two days in Reno, the 'Biggest Little City in the World.'" Be that as it may, it is well established that "an officer is not required to draw a reasonable inference that favors innocence when there also is a reasonable inference that favors probable cause." ***State v. Nieves***, 2007 WI App 189, ¶14, 304 Wis. 2d 182, 738 N.W.2d 125.

---

[8] The parties do not address whether the "mere propinquity" principle—which, on its face, speaks to probable cause to search a "person"—applies with equal force to probable cause to search automobiles, in which people have a "diminished expectation of privacy." *See **State v. Tompkins***, 144 Wis. 2d 116, 128, 423 N.W.2d 823 (1988). Because we conclude that Nicholas' search was based on more than the Jaguar's mere propinquity to the Impala, we need not address whether the rationale of the "mere propinquity" principle applies with equal force to both persons and automobiles.

¶32     In all, under the totality of the circumstances, sufficient facts existed to "excite an honest belief in a reasonable mind" that the Jaguar contained drugs or other illegal contraband.  *See **Lefler***, 346 Wis. 2d 220, ¶8.  Nicholas therefore had probable cause to search the Jaguar, and the circuit court did not err by denying Kirk's motion to suppress.

*By the Court.*—Judgment affirmed.

Not recommended for publication in the official reports.